**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| BENNU TITAN LLC (F/K/A ATP TITAN LLC),[1] | Case No. 16-11870 (LSS) |
| Debtor. | **Related Docket No. 43**<br>**Hearing Date:  November 1, 2016 at 10 a.m. EST**<br>**Objections Due:  October 19, 2016 at 4 p.m. EST** |

**OBJECTION OF THE SECURED PARTIES TO BENNU OIL & GAS, LLC'S
MOTION TO DISMISS OR SUSPEND DEBTOR'S BANKRUPTCY CASE
PURSUANT TO 11 U.S.C. §§ 1112(b) AND 305(a)**

CLMG Corp., as the agent (the "**Agent**"), and Beal Bank USA, as the lender (the "**Lender**" and, together with the Agent, the "**Secured Parties**"), under that certain Term Loan Agreement, dated as of September 24, 2010 (as amended, the "**Titan Credit Agreement**"), by and among Bennu Titan LLC (f/k/a ATP Titan LLC), as the borrower (the "**Debtor**"), the Agent, the Lender and the other lenders from time to time party thereto, by and through their undersigned counsel, hereby submit this objection (the "**Objection**")[2] to Bennu Oil & Gas, LLC's (the "**Parent**") *Motion To Dismiss Or Suspend Debtor's Bankruptcy Case Pursuant To 11 U.S.C. §§ 1112(b) and 305(a)* [D.I. 43] (the "**Motion to Dismiss**") in the above-referenced chapter 11 case (this "**Case**").  In support of the Objection, the Secured Parties respectfully represent as follows:

---

[1] The last four digits of Bennu Titan LLC's federal taxpayer identification number are 5187.

[2] Capitalized terms in this Objection shall have the meanings ascribed to them in the *Emergency Motion of the Secured Parties for an Order Directing Appointment of a Chapter 11 Trustee* [D.I. 8] (the "**Trustee Motion**")

## PRELIMINARY STATEMENT

1.      This is an involuntary bankruptcy case that was commenced by the Secured Parties on August 11, 2016.  At that time, the Debtor's board of managers was composed of seven individuals.  Shortly after the involuntary petition was filed, four of the managers resigned, leaving the Debtor to be managed by John V. Simon and Harrison Bubrosky, both of whom are also managers of the Parent[3] (the "**Conflicted Managers**"), and Mr. Albert J. Fioravanti, the Debtor's sole independent manager (the "**Independent Manager**").

2.      Having acknowledged receipt of the summons for the involuntary petition, the Debtor, through the Conflicted Managers and the Independent Manager, chose not to contest the involuntary petition (or even initially appear in the Case).  Consequently, the Court entered an order for relief on September 9, 2016.  On September 15, 2016, the Secured Parties filed the Trustee Motion.   On September 26, 2016, the Independent Manager resigned, leaving the Conflicted Managers as the Debtor's sole fiduciaries.  That same day, the Conflicted Managers – who, wearing their "Debtor hats", chose not to contest the involuntary petition – filed the Motion to Dismiss, wearing their "Parent hats", arguing that dismissal is in the Debtor's best interest.

3.      The Parent sets forth three grounds to dismiss or suspend this Case.  None of them has any merit.  *First*, the Parent argues it has shown "cause" to dismiss under § 1112(b) of the Bankruptcy Code because this Case is a two-party dispute.  This is simply false.  In addition to the Secured Parties and the Debtor, the Debtor's Schedules of Assets and Liabilities (signed by Mr. Simon under penalty of perjury) list the Parent, Bureau of Ocean and Energy Management ("**BOEM**"), and Bureau of Safety and Environmental Enforcement ("**BSEE**") as unsecured

_____

[3] Mr. Simon is also the Parent's CEO.

creditors of the Debtor.   Additionally, Statoil USA E&P Inc. ("**Statoil**"), as the co-owner (along with Parent) of the lease on which the Debtor's floating production platform (the "**Platform**") is located, will have a material role in this Case as it is obligated under such lease and by applicable regulation to maintain the Platform and to ensure the safe abandonment (*i.e.*, retirement) of the Platform.  The Debtor's former managers and officers have also recently reserved their rights to assert claims against the Debtor.   Moreover, two-party disputes are not cause for dismissal under Section 1112(b) where (i) the bankruptcy case was commenced by a creditor (since the Bankruptcy Code expressly permits a case to be commenced by a single creditor) and (ii) the case was not filed to disrupt another proceeding pending outside of the bankruptcy court.

4.      *Second*, the Parent asserts that the Case was filed for an improper purpose.  As an initial matter, it is remarkable that the Parent (who rendered the Debtor insolvent by failing to pay the Debtor some $40 million for its use of the Platform over the last eight months) claims that it is improper for the Secured Parties to use the Bankruptcy Code to restructure the Debtor, rather than pursuing remedies in a state court foreclosure proceeding.  The Secured Parties' objectives in commencing the Case are plainly legitimate.  The Case maximizes value for all of the Debtor's stakeholders in a number of ways.  It introduces much needed transparency and court oversight to the Debtor's efforts to prepare for the increasingly likely scenario that the Parent winds down its operation of the Platform, and helps ensure that such wind down is carried out by the Parent in accordance with its obligations under applicable law and the terms of the platform use agreement (the "**PUA**") with the Debtor.  It provides all creditors with a centralized forum to bring their claims and resolve disputes.  It provides the Debtor with the ability to sell assets under Section 363, raise financing under Section 364, and reject or assume executory

3

contracts (such as the PUA) under Section 365.  It also stays litigation and certain other adverse actions against the Debtor, which the Parent has recognized provides value to the Debtor's estate.[4]  Finally, the Chapter 11 process, with its strict rules on disinterestedness, will ensure that whoever is acting as a fiduciary for the Debtor does so in an unbiased manner.

5.     *Third*, the Parent's assertion that this Court should abstain because dismissal of the Case would be in the best interests of *both* the Debtor and its creditors is also wrong.  While bankruptcy courts may abstain in deference to the jurisdiction of another court in an ongoing proceeding, there are no other proceedings here.  Nor should the Secured Parties be required to commence another case or action outside of bankruptcy.[5]  As set forth in the loan documentation and as recognized by case law, the Secured Parties have the right to elect a remedy upon the Debtor's default.  The Secured Parties believe that this Case, through the tools provided for in the Bankruptcy Code, not only best protects their own interests, but also the interests of the other parties involved.

6.     In contrast, the Parent does not explain how it, the Debtor or the Debtor's creditors will be prejudiced by this Case.  Instead, the Parent seems to believe that, since dismissal would keep the Conflicted Managers in unsupervised control of the Debtor, it would force the Secured Parties to agree to the Parent's "high-risk, little-reward" restructuring proposal

---

[4] As described below, the Parent recently wrote a letter to BOEM stressing that the automatic stay and other protections afforded to the Debtor in this Case would likely prevent BOEM from shutting in production on the Platform to the detriment of the Debtor and the Parent based on the Debtor's failure to post a bond relating to future abandonment liabilities.  In such letter, the Parent – in direct conflict with its current position with this Court – argued that a chapter 11 trustee should be appointed in short order and given an opportunity to take all appropriate steps to protect the Debtor from any adverse actions by BOEM.

[5] It is puzzling that the Parent, as the indirect equity holder of the Debtor, would advocate in the Motion to Dismiss that the Secured Parties foreclose on the Debtor's stock, which would necessarily extinguish the Parent's indirect equity interests in the Debtor.

4

in the stalled negotiations.  Such negotiations have been limping along for the last eight months and have effectively reached an impasse due to the economic realities and risks involved with the Parent's proposal.  While discussions may continue, it is in the Debtor's best interests to prepare for the contingency that the Parent winds down operation of the Platform and to explore value-maximizing alternatives that do not involve the Parent.  The Motion to Dismiss should be denied.

## **PROCEDURAL BACKGROUND**[6]

**A.      The Bankruptcy Case**

7.      On August 11, 2016 (the "**Petition Date**"), the Secured Parties filed an involuntary petition under chapter 11 of the Bankruptcy Code, thereby commencing this Case. No objections were filed to the involuntary petition.

8.       On September 9, 2016, this Court entered an order for relief in this Case.

9.      On September 12, 2016, the Parent sent a letter to the BOEM which is attached as Exhibit A to the *Reply Of The Secured Parties In Support Of the Motion to Shorten Notice with Respect to the Emergency Motion of the Secured Parties For an Order Directing Appointment of a Chapter 11 Trustee* [D.I. 21] (the "**Parent Letter**").

10.      In that letter, the Parent requested an extension of time to respond to BOEM's request for bonding and emphasized one of the many benefits of this Case to the Debtor's stakeholders: the automatic stay.  In particular, the Parent explained that because the Debtor owned certain rights of way associated with export pipelines (the "**Export Pipelines**") and because the automatic stay was in effect, BOEM's ability to order such Export Pipelines shut-in for the Debtor's failure to post $3.65 million in prospective bonding would likely be stayed.  *See*

---

[6] The facts laid out in the Trustee Motion are incorporated herein by reference.

Americas 92115040 (2K)

Parent Letter, at ¶ 2 ("On September 9, 2016, an order for relief was entered, providing Bennu Titan full protections as a Chapter 11 debtor afforded by the United States Bankruptcy Code."); *id.* ("[T]he automatic stay and other protections afforded by the United States Bankruptcy Code are in effect."); *id.* ("Bennu Oil [defined herein as the "Parent"] believes that a trustee should be appointed by the United States Bankruptcy Court for the District of Delaware in the Bennu Titan bankruptcy prior to issuance of any shut-in order and that such trustee, once appointed, should be afforded time to analyze the situation and to take appropriate action to protect Bennu Titan's rights under the United States Bankruptcy Code to the extent appropriate.").  The Parent further informed BOEM that "[a]s of the tender of this letter, no [chapter 11] trustee has been appointed [in the Debtor's bankruptcy case]; although we expect such appointment to occur in short order." *Id.*

11.    On September 15, 2016, the Secured Parties filed an *Emergency Motion of the Secured Parties for an Order Directing Appointment of a Chapter 11 Trustee* [D.I. 8] (the "**Trustee Motion**") and a *Motion to Shorten Notice with Respect to the Emergency Motion of the Secured Parties For an Order Directing Appointment of a Chapter 11 Trustee* [D.I. 9].

12.    On September 19, the Conflicted Managers caused the Parent to file the *Response and Objection to the Motion to Shorten Notice with Respect to the Emergency Motion of the Secured Parties For an Order Directing Appointment of a Chapter 11 Trustee* [D.I. 19] ("**Preliminary Trustee Response**") opposing the appointment of a chapter 11 trustee (which appointment it had enthusiastically advocated, just seven days before, in the Parent Letter).

13.    That same day, the Secured Parties filed a *Reply of the Secured Parties In Support Of the Motion to Shorten Notice with Respect to the Emergency Motion of the Secured Parties*

6

*For an Order Directing Appointment of a Chapter 11 Trustee* [D.I. 21], which explained, among other things, the contradictory positions that the Parent had taken with BOEM in the Parent Letter and with the Court in its Preliminary Trustee Response.

14.    On September 21, 2016, the Court held a status conference (the "**Status Conference**"), at which the Parent and the Secured Parties previewed their respective positions on the Trustee Motion, and the Court scheduled a hearing on the Trustee Motion for September 30, 2016.  The Debtor did not appear at the Status Conference.

15.    On September 26, 2016, the Debtor's only independent and non-conflicted manager resigned from his position.

16.    Immediately thereafter, the Conflicted Managers caused the Debtor to file an *Emergency Motion for Entry of An Order Adjourning the Objection Deadline and Hearing on the Emergency Motion of the Secured Parties for an Order Directing the Appointment of a Chapter 11 Trustee* (the "**Motion to Adjourn**"), which sought to delay the hearing on the Trustee Motion until the hearing on the Parent's Motion to Dismiss.

17.    The Motion to Adjourn was filed by the Debtor's new counsel Ashby & Geddes, P.A., who filed a Notice of Appearance in this Case concurrently therewith.  Prior to that date, in addition to sharing the same Conflicted Managers, the Debtor and the Parent had shared the same counsel, Latham & Watkins LLP.  The Debtor's new counsel (whose retainer was paid by the Parent) also reports to the Conflicted Managers and has no independent authority under the Debtor's constituent documents.

18.    Hours after the Conflicted Managers caused the Debtor to file the Motion to Adjourn, the same Conflicted Managers caused the Parent to file the Motion to Dismiss.

Americas 92115040 (2K)

19.    The Court granted the Motion to Adjourn and ordered the Trustee Motion and the Motion to Dismiss be heard concurrently on November 1, 2016.

**B.**    **Restructuring Negotiations**

20.    Over the last eight months, the Parent has failed to pay the monthly amounts due to the Debtor under the PUA – approximately $40 million in the aggregate – for the Parent's continued use of the Platform to process the Parent's hydrocarbons.  During this time, the Debtor's Conflicted Managers have failed to take *any* action to try to collect such payments from the Parent.

21.    Shortly after the Parent stopped paying the Debtor for the use of the Platform, the Secured Parties, the Debtor, the Parent and the Parent's creditors began negotiations regarding a revised PUA.  Prior to the Petition Date, the Secured Parties entered into six consecutive forbearance agreements with the Debtor to allow such negotiations to proceed.  At this juncture, due to the economic realities and risks involved, the negotiations have little prospect of resulting in a meaningful agreement between the parties and have effectively reached an impasse.

22.    The proposal by the Parent and the Parent's creditors involves a high degree of risk.  As described by the Parent's counsel at the Status Conference, the proposed deal would involve, among other things, (i) the agreement of the Parent's existing lenders and equity holders to restructure their respective debts and equity interests, (ii) the funding by one or more of the Parent's existing lenders of over $100 million dollars to drill several wells located on a particular lease, (iii) BOEM allowing the Parent to drill the additional wells and agreeing to a "tailored plan" with respect to the Parent's current and future plugging and abandonment obligations, (iv) the Parent expeditiously procuring a drilling rig and an operator to drill such wells, (v) the

8

prompt commencement of drilling operations before the termination of the lease held by the Parent, (vi) oil and gas being discovered from such drilling in the targeted zones and (vii) hydrocarbon production from the new wells at levels consistent with the most optimistic projections of the Parent.  Even then, the Debtor would receive relatively minor payments for the Parent's use of the Platform to drill, and produce from, the new wells until the Parent's new loans are repaid in full (which could take more than two years).  Under such an arrangement, the Debtor in effect would bear the risk of the foregoing events not coming to fruition.

23.    If a deal cannot be reached in time for the Parent to drill the new wells before its lease expires, the Parent has told the Secured Parties that it will wind down operations of the Platform, which process the Parent believes will take approximately 30 to 60 days. (Levy Declaration In Support of the Preliminary Trustee Response, at ¶ 4)

24.    If the Parent winds down operations of the Platform, the Debtor will have to be prepared to, among other things: (i) engage with BOEM, BSEE and Statoil – the remaining title owner under the lease on which the Platform is located – to make arrangements for the transition of the operation of the Platform to Statoil (or another operator) and to ensure that the Platform is maintained in accordance with all applicable safety, environmental and health standards, (ii) obtain from the Parent all documents and information relevant to the maintenance and operation of the Platform, and (iii) explore the various alternatives to maximize the value of the Platform for the benefit of the Debtor's stakeholders, including (a) the sale of the Platform through a robust marketing process and (b) leasing the Platform to one or more parties to produce

9

hydrocarbons.[7]  To the Secured Parties' knowledge, none of those measures are currently being

undertaken, or even planned for by the Debtor.

## ARGUMENT

### A.    This Case Is Not A Two-Party Dispute

25.    The Parent's main argument is that this Case should be dismissed for "cause"

under Section 1112(b) because it is a two-party dispute between the Debtor and the Lender

(Motion to Dismiss at 1, 16).  But, this Case is *not* a two-party dispute.  The Case involves at

least six parties in interest, and likely more.  The Schedules of Assets and Liabilities filed by the

Debtor (and signed under penalty of perjury by the Parent's CEO and manager, Mr. Simon, in

his capacity as a manager of the Debtor) [D.I. 14] (the "**SoAL**") demonstrate that two

governmental agencies – BOEM and BSEE – are also creditors of the Debtor, each having

contingent, unliquidated unsecured claims estimated in the amount of $3.64 million, arising from

future estimated plugging and abandonment costs associated with the Export Pipeline rights of

way.[8]  (SoAL, Ex. E/F at 2)  Apart from their role as creditors, these government agencies have a

unique interest in the outcome of this Case and in ensuring that the Platform, Export Pipelines

and related assets are maintained in a safe manner.  Moreover, the SoAL provides that the

Parent, in addition to being the indirect equity holder of the Debtor, is also an unsecured creditor

of the Debtor.  *Id.* (scheduling unsecured claim of the Parent in the amount $2.57 million arising

out of a general and administrative services agreement).  Statoil, as the party that will be liable

---

[7] Although it has the exclusive right to use the Platform under the defaulted PUA (a right for which it has not paid for the last 8 months), the Parent only utilizes only a portion of the Platform's production capacity.

[8] BOEM's claim is based on the demand for supplemental bonding assurance, and BSEE's claim is based on the contingent liability associated with actual abandonment operations in the event that the Debtor fails to abandon the Export Pipelines.

Americas 92115040 (2K)

for the maintenance and abandonment of the Platform in the event the Parent winds down, will also have a major interest in the Case.[9]  Finally, four of the Debtor's managers and two of its officers resigned on August 24, 2016, and expressly reserved all claims they may have against the Debtor, including indemnification claims, in their resignation letters.  (*See* Exhibit 4 to MacWright Declaration attached to Trustee Motion).

26.    The Parent is perfectly aware that this Case is not a two-party dispute.  It states in its Preliminary Trustee Response:  "*Aside from its obligations to* [the Parent] *and to regulatory authorities*, the Debtor (and its direct parent) have no material creditors other than the Secured Parties.*"  (Trustee Motion, at ¶ 3) (emphasis added)  In its Motion to Dismiss, the Parent seeks to ignore BOEM and BSEE's role as creditors by offering to assume the Debtor's liability (but not to actually pay) for the outstanding bonding obligations due to BOEM and BSEE.  Even if that were to happen, the Debtor would remain fully liable to BOEM and BSEE for such amounts in the event that the Parent winds down its operations.

27.    Moreover, of the ten cases cited by the Parent in support of dismissal, only two refer to a two-party dispute as a factor for a dismissal under Section 1112(b), and the facts of those cases are easily distinguishable.  Each of the cases was commenced by a *debtor* without the ability to rehabilitate to disrupt state court actions commenced by its sole creditor.[10]  Here, in

---

[9] As properly reflected in the SoAL, the Debtor's liability to BOEM and BSEE does not extend to the maintenance and abandonment costs of the Platform.  Rather, the Parent and Statoil, as the record title owners of the lease on which the Platform resides, are obligated under such lease to operate and maintain the Platform and remove the Platform from the lease within one year after the termination of such lease, unless otherwise agreed by BOEM.

[10] *In re Scarborough-St. James Corp.*, 2015 Bankr. LEXIS 3258, at *4-5 (Bankr. D. Del. Sept. 24, 2015) (debtor filed a voluntary petition on the eve of an ongoing trial, no other creditors existed, and this Court explicitly referred to the fact that it was unlikely that the debtor would be able to rehabilitate when dismissing the case). *In re Jer/Jameson Mezz Borrower II, LLC,* 461 B.R. 293, 297-298 (Bankr. D. Del. 2011) (debtor filed for chapter 11 as a litigation tactic to prevent an imminent foreclosure sale, and no plan was confirmable; two-party dispute was one of the dozen factors that this Court considered to dismiss the case).

11

contrast, *creditors* initiated the Case to seek to rehabilitate the Debtor.  All the other cases cited by the Parent in support for its proposition that a two-party dispute would constitute cause for dismissal under Section 1112(b) do not even discuss Section 1112(b).[11]  Further, the Bankruptcy Code specifically envisions two-party dispute cases because Section 303(b)(2) allows a single creditor holding a claim in excess of $15,775 to commence an involuntary bankruptcy case. 11 §U.S.C. 303(b)(2) (stating an involuntary petition may be commenced 'by one or more [creditors]'); *see also FMB Bancshares, Inc. v. Trapeza CDO XII, Ltd. (In re FMB Bancshares, Inc.)*, 517 B.R. 361, 372 (Bankr. M.D. Ga. 2014).

###       B.       This Case Serves A Proper Reorganizational Purpose

28.    The Parent also incorrectly asserts "cause" for dismissal under Section 1112(b) because the Secured Parties purportedly filed this Case for improper motives.   (Motion to Dismiss, at 3, 19-20)  In doing so, the Parent again misconstrues the case law on dismissal for cause.

29.    Congress's primary concern when enacting Section 1112(b) was to avoid circumstances in which a debtor would pursue a hopeless reorganization process, or not comply with its essential obligations.  Most illustrative is the list of "causes" for dismissal at Section 1112(b)(4), all of which relate to the debtor's conduct during chapter 11 or a debtor's failure to meet obligations or deadlines in the reorganization process.[12]  Section 1112(b) is always used by

---

[11] Those cases all rely on Section 305 of the Bankruptcy Code, where the existence of a two-party dispute is a factor more readily accepted by courts.  However, as explained below, the burden of proof under Section 305 is particularly heavy, and the facts of this Case would not support a dismissal or suspension under Section 305 either.

[12] Section 1112(b)(4) provides: "for purposes of this subsection, the term "cause" includes—

the courts to prevent abuses by the debtor and protect creditors (whether against a solvent debtor filing bankruptcy without a need to restructure, or against a debtor beyond rehabilitation trying to frustrate creditors that have initiated foreclosure actions). Therefore, it is not surprising that none of the cases cited in the Motion to Dismiss involved a court granting a party in interest's request under Section 1112(b) to dismiss a bankruptcy case based on a creditor's behavior.

30. Even if, *arguendo*, Section 1112(b) was expanded to include the motives of a filing creditor as a cause for dismissal of an involuntary petition, the Parent fails to show that the Secured Parties' motives are not legitimate. Courts have looked at a variety of factors to assess whether a case had been filed for a legitimate reorganization purpose or only as a litigation tactic. For instance, the Third Circuit Court of Appeals has considered whether the bankruptcy filing maximized the value of a debtor's estate, the timing of the filing of the petition and the tactical advantages gained by a debtor in ongoing litigation proceedings. *15375 Memorial*, 589

---

(A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;
(B) gross mismanagement of the estate;
(C) failure to maintain appropriate insurance that poses a risk to the estate or to the public;
(D) unauthorized use of cash collateral substantially harmful to 1 or more creditors;
(E) failure to comply with an order of the court;
(F) unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter;
(G) failure to attend the meeting of creditors convened under section 341(a) or an examination ordered under rule 2004 of the Federal Rules of Bankruptcy Procedure without good cause shown by the debtor;
(H) failure timely to provide information or attend meetings reasonably requested by the United States trustee (or the bankruptcy administrator, if any);
(I) failure timely to pay taxes owed after the date of the order for relief or to file tax returns due after the date of the order for relief;
(J) failure to file a disclosure statement, or to file or confirm a plan, within the time fixed by this title or by order of the court;
(K) failure to pay any fees or charges required under chapter 123 of title 28;
(L) revocation of an order of confirmation under section 1144;
(M) inability to effectuate substantial consummation of a confirmed plan;
(N) material default by the debtor with respect to a confirmed plan;
(O) termination of a confirmed plan by reason of the occurrence of a condition specified in the plan; and
(P) failure of the debtor to pay any domestic support obligation that first becomes payable after the date of the filing of the petition.

13

F.3d 605, 625 (3d Cir. Del. 2009); *see also In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 118 (3d Cir. 2004) (internal citations omitted) ("Whether the good faith requirement has been satisfied is a fact intensive inquiry in which the court must examine the totality of facts and circumstances and determine where a petition falls along the spectrum ranging from the clearly acceptable to the patently abusive.")

31.    Here, the Debtor and the Secured Parties necessarily do not gain any tactical advantage in ongoing litigation proceedings because no litigation proceedings are ongoing. Moreover, there is nothing suspect regrading the timing of the involuntary petition.  It was filed six months after the Debtor defaulted on the Titan Credit Agreement due to the Parent's failure to pay for the use of the Platform, and one month after the sixth forbearance agreement between the Debtor and the Secured Parties had expired.  Further, the filing of this Case maximizes the value of the estates in several distinct ways.

32.    *First*, this Case introduces much needed transparency and court oversight to the Debtor's efforts to prepare for the increasingly likely scenario that the Parent winds down operations of the Platform.

33.    *Second*, this Case provides a centralized forum for all creditors and parties in interest to bring claims, resolve disputes and explore alternatives to maximize stakeholder recoveries.

34.    *Third*, the Debtor's ability to sell assets under Section 363, obtain DIP financing under Section 364[13], and reject executory contracts under Section 365 are important benefits not available in other forums.

---

[13] The Secured Parties stand ready to engage and negotiate a DIP financing.

Americas 92115040 (2K)

35.    *Fourth*, the automatic stay protects the Debtor from litigation, foreclosure or other adverse actions by creditors.  Indeed, the Parent recognized the benefits of the automatic stay when it sent the Parent Letter to BOEM explaining that the automatic stay protected the Debtor (and indirectly the Parent) from adverse actions by BOEM.[14]

36.    *Finally*, the chapter 11 process, with its strict rules regarding disinterestedness, will ensure that the Debtor's fiduciaries will act in an unbiased manner and in the best interests of the Debtor's estate.

### C.    The Bankruptcy Case Serves The Best Interests Of The Debtor And Its Creditors

37.    The Parent also seeks to have this court suspend or abstain from hearing this Case under Section 305(a)(1) of the Bankruptcy Code.  Section 305 of the Bankruptcy Code provides, in pertinent part, "[t]he court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if […] the interests of creditors and the debtor would be better served by such dismissal or suspension."  11 U.S.C. § 305(a)(1). Abstention pursuant to this Section is an extraordinary remedy and should only be granted if abstention is in the best interests of both the debtor and its creditors.  *See In re AMC Investors, LLC*, 405 B.R. 478, 487-88 (Bankr. D. Del. 2009) ("The courts that have construed § 305(a)(1h) are in general agreement that abstention in a properly filed bankruptcy case is an extraordinary remedy, and that dismissal is appropriate under § 305(a)(1) only in the situation where the court finds that both 'creditors and the debtor' would be 'better served' by a dismissal."); *In re*

---

[14] *See* Parent Letter, at 3 (the Parent informing BOEM that "Bennu Oil [defined herein as the "Parent"] believes that a *trustee should be appointed* by the United States Bankruptcy Court for the District of Delaware in the Bennu Titan bankruptcy *prior to issuance of any shut-in order and that such trustee*, once appointed, should be afforded time to analyze the situation and to *take appropriate action to protect Bennu Titan's rights under the United States Bankruptcy Code to the extent appropriate*.") (emphasis added)

15

*Northshore Mainland Servs., Inc.*, 537 B.R. 192, 203 (Bankr. D. Del. 2015); *In re Aerovias Nacionales de Colom. S.A. Avianca*, 303 B.R. 1, 9 (Bankr. S.D.N.Y. 2003).  As such, "granting an abstention motion pursuant to § 305(a)(1) requires more than a simple balancing of harm to the debtor and creditors; rather, the interests of both the debtor and its creditors must be served by granting the requested relief." *In re Northshore Mainland Servs.*, 537 B.R. at 203 (emphasis added); *see also In re Monitor Single Lift I, Ltd.*, 381 B.R. 455, 462 (Bankr. S.D.N.Y.); *In re Smith*, 415 B.R. 222, 238-39 (Bankr. N.D. Tex. 2009); *In re Eastman*, 188 B.R. 621, 624 (B.A.P. 9th Cir. 1995).  The moving party bears the burden to demonstrate that the interests of both the debtor and its creditors would benefit from dismissal or suspension of proceedings under Section 305(a)(1).  *In re AMC Investors, LLC*, 405 B.R. at 488.

38.    Courts look at a number of factors to determine whether suspension/abstention or dismissal under Section 305(a)(1) is in the best interest of creditors.  Such factors include (i) economy and efficient administration; (ii) whether another forum is available to protect the interests of both parties or if there is already a pending proceeding in state court; (iii) whether federal proceedings are necessary to reach a just and equitable solution; (iv) whether there is an alternative means of achieving an equitable distribution of assets; (v) whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case; (vi) whether a non-federal insolvency has proceeded so far that it would be costly and time consuming to start afresh with the federal bankruptcy process; and (vii) the purpose for which bankruptcy jurisdiction has been sought.  *Id.; In re Paper I Partners, L.P.*, 283 B.R. 661, 679 (Bankr. S.D.N.Y. 2002)

Americas 92115040 (2K)

39.     The Parent incorrectly claims that these factors support dismissal because the Secured Parties could foreclose on their collateral.  (Motion to Dismiss at ¶ 25)  The Parent does not, and cannot, cite any authority to support its argument that a case should be dismissed against a creditor's wishes because that creditor may elect to exercise non-bankruptcy rights in state court.  Case law holds to the contrary.  In *FMB Bancshares, Inc. v. Trapeza CDO XII, Ltd. (In re FMB Bancshares, Inc.),* the debtor filed a motion to dismiss an involuntary chapter 11 case commenced by the debtor's sole non-insider creditor, arguing, among other things, that dismissal was proper under Section 305(a).  517 B.R. 361, 373 (Bankr. M.D. Ga. 2014).  In considering the best interests of the debtor and the creditor, the court noted that "[the petitioning creditor] is a sophisticated party and has *considered its options carefully and has chosen its remedy in bankruptcy*.  [The petitioning creditor] feels that bankruptcy is the proper forum to enforce its rights and the Court *will not second guess its business judgment*."  *Id.* at 373-74 (emphasis added).  Accordingly, the court held that dismissal was not in the best interests of both the debtor and the creditor.

40.     In denying the motion to dismiss, the *FMB Bancshares* court also considered whether the chapter 11 case was "a two-party dispute that would be more appropriately decided in a court of general jurisdiction."  *Id.* at 374.  The court noted that although some courts have held that a two-party dispute theory is an appropriate ground for abstention, such abstention "may be appropriate *only* where there is another forum available to adequately protect the interests of the parties."  *Id.* (citing *In re Spade*, 258 B.R. 221, 234 (Bankr. D. Col. 2001) (emphasis added).  In addressing the availability of an alternative forum, the court found that:

> Here, there is no dispute that [the creditor] could seek to enforce its rights in another forum as the Indenture specifically allows [the

17

creditor] to file a "suit" to enforce payment.  However, [the creditor] chose this Court and jurisdiction is proper.  Dismissal would likely result in a long protracted litigation in a court of general jurisdiction and force [the creditor] to wait even longer for any recovery of its investment.  [The debtor] may be correct that this Court is not the *best* forum, but [the creditor] is a proper creditor under § 302(b)(2) and jurisdiction in this Court is appropriate under § 303.  Therefore, the Court will not exercise the extraordinary power of abstention because it is not clear to the Court that both the debtor and creditors would be better served by this Court relinquishing jurisdiction, and the court is not certain that [the creditor] could obtain adequate relief in another forum.

*Id*. at 374 (emphasis in original).

41.    Likewise, the Secured Parties here have considered their options and chosen not to foreclose on their collateral.  Nor should they have to, as the Secured Parties negotiated in the Titan Credit Agreement and related security, mortgage and pledge agreements,[15] for the right, *but not the obligation*, to foreclose on the encumbered assets or the equity interests in the Debtor.[16]  And like the creditor in *FMB Bancshares*, the Secured Parties – and Debtor – are entitled to the protections afforded by the Bankruptcy Code.  So instead of commencing an inefficient, time-consuming and piece-meal foreclosure process (which the Secured Parties suspect the Parent would challenge to gain additional time and leverage), the Secured Parties have chosen a path that allows the Debtor to restructure in a manner that is beneficial to all stakeholders.  This Case will maximize the value of the Platform (and minimize Statoil's

---

[15] Section 7.02(b) of the Titan Credit Agreement ("In the case of the occurrence of an Event of Default, the Agent and the Lenders will have all other rights and remedies available at Law and equity subject to the applicable terms of the Security Documents.") and Section 9.02(c) ("The rights and remedies of the Agent and the Lenders under the Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have.")

[16] In the same manner, the Secured Parties have elected not to exercise their rights under the pledge agreement to displace the Debtors' managers.  The Secured Parties decided instead to request the appointment of a chapter 11 trustee, which would entirely remove the Parent's control over the Debtor and allow a trustee to be appointed in accordance with the procedures established in the Bankruptcy Code.

Americas 92115040 (2K)

potential future liabilities relating to an abandonment of the Platform) by allowing the Debtor's stakeholders to explore various alternatives, including leasing out the Platform to numerous operators or pursuing an asset sale.

42.     Moreover, as stated above, dismissal is appropriate under §305(a)(1) only in the situation where the court finds that *both* creditors and the debtor would be better served by a dismissal.  Here, the Debtor and its non-insider creditors do not support the Motion to Dismiss. In fact, the Debtor's main creditor is firmly objecting to the Motion to Dismiss.  And, as this Court noted in a case cited by the Parent, it is not in the best interests of a debtor to abstain under Section 305 when it is unclear how a bankruptcy petition would be harmful to the debtor.  *In re AMC Investors, LLC*, 406 B.R. 478, 489.  Here, dismissal would certainly hurt the Debtor and its non-insider creditors by allowing the Debtor to be controlled by the Parent and directed to elevate the Parent's interests over the interests of the Debtor and the Debtor's non-insider creditors.

43.     Finally, the Parent's request on September 26, 2016 for a *one month* suspension of this Case to accommodate further restructuring discussions will be moot by the time of the November 1st hearing.  As set forth above, after languishing for over eight months and through six forbearance agreements, the discussions have effectively reached an impasse.  While the Secured Parties are willing to continue talking with the Parent and its creditors, such discussions can and should occur in parallel with this Case.  There is no reason to think that suspending this Case would change the economic realities and risks involved with the Parent's proposal or somehow bring the parties closer to an agreement.  Rather, this Case should proceed, as every

19

passing day increases the likelihood that the Parent will wind down operations of the Platform –

a scenario for which the Debtor must diligently prepare.

*[Remainder of page intentionally left blank.]*

20

## CONCLUSION

WHEREFORE, for the foregoing reasons, the Secured Parties respectfully request that the Court deny the Motion to Dismiss and grant such other relief as the Court deems just and proper.

Dated:  October 19, 2016

Respectfully submitted,

**FARNAN LLP**

By: /s/ Michael J. Farnan
    Joseph J. Farnan, Jr., Esq. (Bar No. 100245)
    Joseph J. Farnan, III, Esq. (Bar No. 3945)
    Michael J. Farnan, Esq. (Bar No. 5165)
    919 North Market St., 12th Floor
    Wilmington, DE 19801
    Telephone:    (302) 777-0300
    Facsimile:    (302) 777-0301
    farnan@farnanlaw.com
    jjfarnan@farnanlaw.com
    mfarnan@farnanlaw.com

—and—

**WHITE & CASE LLP**

Thomas E Lauria, Esq. (*pro hac vice*)
Southeast Financial Center, Suite 4900
200 South Biscayne Blvd.
Miami, FL 33131
Telephone:    (305) 371-2700
Facsimile:(305) 358-5744
tlauria@whitecase.com

J. Christopher Shore, Esq. (*pro hac vice* to be filed)
Claudine Columbres, Esq. (*pro hac vice* to be filed)
Thomas MacWright, Esq. (*pro hac vice* pending)
1155 Avenue of the Americas
New York, NY 10036

21

Telephone:        (212) 819-8200
Facsimile:(212) 354-8113
cshore@whitecase.com
ccolumbres@whitecase.com
tmacwright@whitecase.com

*Attorneys for the Secured Parties*

22